**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| ROBERT MULLARKEY, | HONORABLE KAREN M. WILLIAMS |
| *Plaintiff,* | Civil Action<br>No. 22-3083 (KMW-AMD) |
| v. | |
| DELAWARE RIVER PORT AUTHORITY;<br>JOHN DOES 1-5 (fictitious individuals); and<br>ABC BUSINESS ENTITIES 1-5 (fictitious<br>business entities), | **OPINION** |
| *Defendants.* | |

APPEARANCES:

Erica Domingo, Esq.
**JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS, P.C.**
1000 Haddonfield-Berlin Road, Suite 203
Voorhees, NJ 08043

*Attorneys for Plaintiff Robert Mullarkey*

William F. Cook, Esq.
Therese M. Taraschi, Esq.
**BROWN & CONNERY, LLP**
360 Haddon Avenue
Westmont, NJ 08108

*Attorneys for Defendant Delaware River
Port Authority*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

This matter comes before the Court on Defendant Delaware River Port Authority's

("Defendant") Motion for Summary Judgment (ECF No. 55, "MSJ Br.") pursuant to Fed. R. Civ.

P. 56. The Motion is opposed by Plaintiff Robert Mullarkey ("Plaintiff"), who claims that his

former employer, Defendant, discriminated and retaliated against him because of his alleged

disability, and that he was otherwise qualified to perform the essential functions of a New Jersey

police officer, with or without reasonable accommodations by Defendant. (ECF No. 59, "Pl.'s Opp. Br.") For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.[1]

## II.    BACKGROUND

### a.    Plaintiff's Application to Defendant

Defendant, Delaware River Port Authority, is a regional transportation agency that serves as steward of four bridges that cross the Delaware River between Pennsylvania and New Jersey: the Ben Franklin, Walt Whitman, Commodore Barry, and Betsy Ross Bridges. (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1, ECF No. 55.) Through its Port Authority Transit Corporation, Defendant also operates a transit line between Camden County, New Jersey, and Center City Philadelphia. (*Id.*)

On May 3, 2021, Plaintiff passed the written examination for the position of Police Officer with Defendant. (*Id.* ¶ 2.) He was interviewed for the position, completed a background check, and was ultimately declared qualified for the position on or about June 29, 2021. (*Id.* ¶ 3.) The hiring process for a Police Officer position at Defendant included passing written and physical fitness examinations, a background check, being interviewed, and undergoing a psychological evaluation to determine whether the applicant is qualified for the position. (*Id.* ¶ 4.)

On July 21, 2021, Plaintiff was offered the position of "Police Officer" in Defendant's Public Safety or Transit Unit department at the hourly rate of $27.49. (*Id.* ¶ 5.) The offer letter stated, in part: "This employment offer, however, is contingent upon successful medical/physical evaluations and background investigation. Regular full-time employment with the Delaware River Port Authority is also contingent upon successful completion of the Police Academy Training

---

[1] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

Program. Thereafter, you must successfully complete a twelve (12) month probationary period as detailed in the FOP Agreement." (*Id.*) The "Job Description/Specification" for the Police Officer position mandates that an applicant "must complete a state law enforcement certification in New Jersey." (*Id.* ¶ 6.) Article VIII, Section 3, of the Agreement between Defendant and Fraternal Order of Police Lodge 30 ("FOP Agreement") mandates successful completion of a training course at an approved Police Academy ("Academy"):

> Section 3. Qualified applicants for the position of patrol officers will be hired without regard to the source of application. Patrol officers shall be considered as probationary during the first twelve (12) months of their employment and may be terminated, laid off, promoted, demoted, disciplined, or transferred at the sole discretion of [Defendant], and they shall not be entitled to utilize the provisions of the grievance procedure. Each new patrol officer must successfully complete a training course at an approved Police Academy within his twelve (12) calendar month probationary period as a condition of employment.

(*Id.* ¶ 7 (citing Def's Ex. F, 3-6.)) On July 23, 2021, Plaintiff signed the Position Acceptance Form attached to his offer letter, affirming his understanding of the terms and conditions of his employment with Defendant. (*Id.* ¶ 8.) On July 30, 2021, Plaintiff began his employment as a Police Officer with Defendant. (*Id.* ¶ 9.)

Plaintiff was made aware: (1) during the hiring process, (2) during his on-boarding for the police officer position, (3) in his offer letter, job description, and the FOP agreement, and (4) following his medical episode at the Academy that successfully completing the Academy and obtaining his NJ PTC certification within his twelve calendar month probationary period was a condition of his employment with Defendant, and that he would not remain employed with Defendant if he failed to do so. (*Id.* ¶¶ 11-12.) Plaintiff made several requests for a waiver from Academy training, both prior to being hired by Defendant and prior to starting the Academy, on the grounds that he was already a certified police officer in Pennsylvania. (*Id.* ¶ 13.)

3

The New Jersey Police Training Commission ("NJPTC") exclusively determines whether an individual will be granted a waiver from attending all or a portion of the Academy. (*Id.* ¶ 14.) Defendant does not make the decision of whether to grant a waiver, though it is permitted to request a waiver from the Academy training on an employee's behalf. (*Id.* ¶ 15.) Defendant's policy, however, is to not seek waivers on behalf of newly hired officers with out-of-state certifications and requires newly hired officers to attend a New Jersey Police Academy. (*Id.* ¶ 17.) Over the years, at least fourteen newly hired officers with out-of-state certifications, many from Pennsylvania, were required to attend the Basic Class for Police Officers ("BCPO") at a designated New Jersey Police Academy as a condition of their employment with Defendant. (*Id.* ¶ 18.)

**b. Plaintiff's Medical Episode**

The Camden County College Police Academy ("Academy") is certified by the NJPTC to offer basic police officer training. (*Id.* ¶ 19.) The Academy is administered by a partnership between Camden County College, the Camden County Prosecutor's Office, and the Camden County Chiefs of Police—Defendant does not administer the Academy. (*Id.* ¶ 20-21.) The NJPTC sets standards recruits are required to complete to graduate from the Academy, including the attendance requirement that a recruit may only miss ten (10) days of classroom training or fifteen (15) days of physical training or be dismissed from the Academy. (*Id.* ¶ 22-23.) The Academy cannot deviate from the NJPTC's standards. (*Id.* ¶ 24.)

On August 2, 2021, Plaintiff began his Academy training as a member of BCPO Class 79, which was scheduled to run from August 2, 2021 until December 16, 2021. (*Id.* ¶ 26.) The same day, Plaintiff signed an acknowledgment of his understanding that failure to meet the physical training and classroom attendance requirements would result in his dismissal from the Academy for cause. (*Id.* ¶ 27.) On August 9, 2021—the first day of physical training ("PT") and first PT test

for Class 79—Plaintiff fainted while running around the track on the physical training field at the Academy and was taken by ambulance to Jefferson Stratford Emergency Department ("Jefferson"). (*Id.* ¶ 31.) Plaintiff was diagnosed by emergency room physicians, Dr. Alan Lucerna, DO and Alexis Dunn, DO, with "heat syncope,[2] initial encounter; acute kidney injury; and dehydration." (*Id.* ¶ 32.) Plaintiff was not admitted to the hospital—he was discharged after eight (8) hours with a note from Dr. Lucerna indicating "Robert Mullarkey was seen and treated in our emergency department on August 9, 2021. He may return to work on 08/16/2021." (*Id.* ¶ 33.)

In the discharge paperwork, Plaintiff was advised to seek follow-up consultation with a cardiologist, nephrologist, and primary care physician. (*Id.* ¶ 34.) On August 9, 2021, Plaintiff's supervisor, Sergeant Santry, forwarded an email to Lieutenant Anthony Aceto at the Academy, advising that Plaintiff "is NOT CLEARED to report to the Camden County Police Academy tomorrow for class or for physical training. Please note, this employee is not being cleared by the hospital at this time. Claims Administration will provide instructions once they are made available by the hospital. The employee will remain out of work until directed otherwise by Claims Administration." (*Id.* ¶ 35.)

On August 9, 2021, Plaintiff provided Kevin Kerr, Defendant's Claims Clerk, with his discharge paperwork from Jefferson. The following day, Kerr provided this paperwork to Quallynx, Defendant's third-party administrator. (*Id.* ¶ 36.) On August 10, 2021, Plaintiff provided Sergeant Santry with the DRPA Employee Accident/Incident Report ("Report"). (*Id.* ¶ 37.) Sergeant Santry promptly completed the supervisor portion of the Report and provided the completed Report to Defendant's Acting Chief of Police, who forwarded it to Defendant's Claims Administration. (*Id.*) That afternoon, Defendant's Claims Administrator Brenda Pringle provided

---

[2] "Syncope is another word for fainting or passing out. Someone is considered to have syncope if they become unconscious and go limp, then soon recover." (SUMF n.3.)

the Report to Qual-lynx and requested that a nurse be assigned. (*Id.* ¶ 38.) Plaintiff was promptly assigned to Kelly Roth, RN, Nurse Case Manager Sr. Specialist, Qual-lynx Workers' Compensation. (*Id.*) Roth scheduled Plaintiff with the first available appointments for cardiac and kidney evaluations, on August 16 and 20, 2021, respectively. (*Id.* ¶ 39.)

Plaintiff visited The Heart House for his cardiac evaluation on August 16, 2021. (*Id.* ¶ 40.) The Impressions/Plan from the visit notes indicates, in part, "[Plaintiff] follows up today after being discharged from the hospital for what sounds like acute dehydration followed by heat exhaustion and probable early heatstroke symptoms." (*Id.*) During that visit, an echocardiogram ("EKG") and treadmill stress test were ordered and Plaintiff was advised to "hold off on returning to the police academy until his cardiovascular testing is done." (*Id.* ¶ 41.) On August 20, 2021, Plaintiff visited Banerjee Kidney Center. (*Id.* ¶ 42.) The "History of Present Illness" section of the visit notes indicates, in part, "Training for the police academy, 8/9; Running for 1.5 miles, then .25 miles, then .3 mile in 85 degree heat with humidity without water. Had an episode of syncope." (*Id.*) On August 20, 2021, Banerjee Kidney Center cleared Plaintiff to return to work from a renal standpoint without restrictions, noting "Pt. has made a full recovery from his AKI, he is cleared to go back to work from a renal standpoint." (*Id.* ¶ 43.) The Qual-lynx paperwork completed by Banerjee Kidney Center indicated Plaintiff may return to work "as long as cardiology clears." Regarding restrictions for the injury, it indicates "Does not apply from renal standpoint." (*Id.* ¶ 44.)

On August 25, 2021, Roth provided Pringle with Plaintiff's appointment notes and notified her that their insurance provider continued to keep Plaintiff from work pending an EKG scheduled for August 26, 2021, and stress test scheduled for September 13, 2021. (*Id.* ¶ 45.) She further noted that Plaintiff had been cleared from a renal standpoint. (*Id.*) On September 13, 2021, Plaintiff

visited the Heart House again for the ordered testing. (*Id.* ¶ 46.) The next day, The Heart House cleared Plaintiff to return to work without restrictions, indicating "[Plaintiff] has been following [up] at The Heart House and had an extensive cardiovascular workup. His workup has been completed and there is no contraindication for him to return to his full-time job and training as a police officer." (*Id.* ¶ 47.) Thus, on September 14, 2021, Plaintiff was cleared to return to full duty without restrictions, on September 14, 2021. (*Id.* ¶ 48.)

Plaintiff never provided Defendant with any medical documentation indicating he required restrictions or light duty. (*Id.* ¶ 50.) Between August 10, 2021 and September 14, 2021, Plaintiff believed he could not attend the classroom portion or the PT portion of the Academy. (*Id.* ¶ 51.) It was not until September 14, 2021 that Plaintiff believed himself physically capable of proceeding with the Academy. (*Id.* ¶ 52.) The August 9, 2021 incident was the first and only time Plaintiff experienced heat syncope—he has not experienced it since. (*Id.* ¶ 53.)

### c. Plaintiff's Worker's Compensation Claim and Alleged Adverse Employment Decision

After Plaintiff's injury at the Academy on August 9, 2021, he did not return to the Academy and exceeded the number of permitted Academy absences as set by the NJPTC. (*Id.* ¶ 54.) The Academy notified Plaintiff that he had missed too many days of the Academy and that they had to dismiss him, or he could resign in good standing. (*Id.* ¶ 55.) Plaintiff sent Defendant an email stating he did not feel comfortable resigning from the Academy without further guidance from Defendant and acknowledged he was advised that his employment was contingent on graduating from the Academy. (*Id.* ¶ 62.) Plaintiff also renewed his request for a waiver from Academy training on the grounds that he held a Pennsylvania certification and was "already an active police officer" in Pennsylvania. (*Id.*)

On August 24, 2021, Kerr responded to an email from Kelley Forbes, Defendants Human Resources Director, indicating Plaintiff is eligible for workers' compensation benefits and is receiving such benefits. (*Id.* ¶ 64.) Plaintiff received workers' compensation benefits—lost wages and medical bills—through Qual-lynx until he provided notes from the specialists indicating he was cleared to return to full duty. (*Id.* ¶ 65.) Plaintiff was actually overpaid for a period of time until the error was discovered and he was paid exclusively workers' compensation benefits. (*Id.* ¶ 66.) Defendant never sought to recoup the overpayment from Plaintiff. (*Id.*)

Forbes researched whether Plaintiff could receive a waiver and her department determined that Defendant "never granted waivers to PA Academy graduates. They always had to attend the full NJ Police Academy." (*Id.* ¶ 67.) On August 24, 2021, Plaintiff resigned from the Academy and notified Defendant. (*Id.* ¶ 71.) Defendant deemed Plaintiff's resignation from the Academy as a resignation from Defendant. (*Id.* ¶ 81.) On September 8, 2021, Forbes emailed Plaintiff as follows:

> Your letter offering employment with the DRPA as a police officer was clear that continued employment was contingent on completing the Police Academy. Specifically, your offer letter dated July 21, 2021 states in pertinent part: "Regular full-time employment with the Delaware River Port Authority is also contingent upon successful completion of the Police Academy Training Program. Thereafter, you must successfully complete a twelve (12) month probationary period as detailed in the FOP Agreement." In light of the fact that you resigned from the Police Academy, you are no longer able to meet the condition of employment as a police officer. A waiver from participating in the Police Academy is not an option. Therefore, your employment with the Delaware River Port Authority ended when you tendered your resignation to the Academy and is effective as of Tuesday, August 24, 2021. I wish you all the best in your future endeavors.

(*Id.* ¶ 86.) In his deposition, Sergeant Santry testified that he recalled approximately half a dozen injured recruits over the years remaining on the payroll while recovering from minor sprains and strains but did not recall that any of them had more than ten absences from the Academy,

resigned, or were no longer enrolled. (Plaintiff's Counterstatement of Material Facts ("CSUMF") ¶¶ 190-191.) On September 9, 2021, Acting Chief Cobbs signed Plaintiff's DRPA/PATCO Employee Separation form recording his separation from Defendant as a resignation. (*Id.* ¶ 87.)

In the worker's compensation proceedings, Dr. Gary Goldstein, M.D., evaluated Plaintiff on July 28, 2022 and issued a permanency report on behalf of the Defendant noting in the "History of Present Illness," section:

> He was told that he needed to see certain specialists to include a renal specialist and a cardiologist. It took some time for these evaluations to be completed. He was able to return to full-duty work at his previous jobs and continues to work in this capacity. He works 40 hours a week at one job and 12-14 hours in the other job. He does not have any work accommodations and does not feel he needs any. He has never had any particular musculoskeletal or systemic issues that affects his performance.

(*Id.* ¶ 95.) In the "Current Status" section, Dr. Goldstein noted the following: "There is nothing that [Plaintiff] needs to do or feels that he should be able to do that he cannot do. . . The patient has no long-term ill-effect or permanency reasonably attributable to the incident of 08/09/2021. . . The patient himself feels that he has no long-term ill-affect or permanency reasonably attributable to the 08/09/21 incident. (*Id.* ¶¶ 96-98.)

**d. Plaintiff's Subsequent Employment**

Plaintiff returned to work in October 2021—a few weeks after his resignation from the Academy—as a police officer with his Pennsylvania police department on a part-time basis. (*Id.* ¶ 100.) In November 2021, Plaintiff obtained full-time employment as a police officer at Lincoln University Pennsylvania. (*Id.* ¶ 101.) Plaintiff has worked as a full-time police officer at Drexel University since 2022. (*Id.* ¶ 102.) Plaintiff was able to work continuously in law enforcement and perform the duties of a Pennsylvania police officer from October 2021 to the present. (*Id.* ¶ 102.) Plaintiff. (*Id.* ¶ 104.)

### III.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The threshold inquiry is whether there are "any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Quincy Mut. Fire Ins. Co. v. Scripto USA*, 573 F. Supp. 2d 875, 878 (D.N.J. 2008) (quoting *Liberty Lobby*, 477 U.S. at 250).

## IV.    DISCUSSION

### a.    Plaintiff Cannot Establish a Discrimination Claim Pursuant to the ADA.

The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's claims of discrimination under Title VII. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). First, Plaintiff "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). To establish a *prima facie* case for disability discrimination under the ADA, a plaintiff must demonstrate that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the court but the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied." *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007).

Next, "if a plaintiff makes out the *prima facie* case, the burden shifts to the employer to show that the adverse employment decision happened for legitimate, non-discriminatory reasons." *Alston v. Park Pleasant, Inc.*, 679 Fed. App'x. 169, 171 (3d Cir. 2017) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Then, if the defendant succeeds, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). "If

each side meets its burden at each stage, then summary judgment is inappropriate." *Williams v. Inspira Health Network*, No. 22-07, 2023 WL 7151222, at *15 (D.N.J. Oct. 31, 2023) (citing *Wishkin*, 476 F.3d at 185).

### i.  **Plaintiff Is Not Disabled Within The Meaning Of The ADA.**

A disability within the meaning of the ADA is defined as: "(A) a physical or mental impairment that *substantially limits* one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1) (emphasis added). An individual is "regarded as having such an impairment" if "the individual establishes that he or she has been subjected to an action prohibited . . . because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

The Court assesses whether a person is "substantially limited" in a major life activity on a case-by-case basis. *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015); *see also* 29 C.F.R. § 1630.2(j)(1)(iv) (requiring "individualized assessment"). "This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both transitory and minor." 29 C.F.R. § 1630.2(g)(1)(i)-(iii).

The Equal Employment Opportunity Commission ("EEOC") has further provided guidance that the term of "physical impairment" to mean: "Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs),

cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). It is well settled in the Third Circuit that "a temporary, non-chronic impairment of short duration is not a disability covered by the ADA." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (citing *McDonald v. Pa. Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 96 (3d Cir. 1995)); *see also Gardner v. SEPTA*, 410 F. Supp. 3d 723, 736 (E.D. Pa. 2019) (Kenney, J.), *aff'd*, 824 F. App'x 100 (3d Cir. 2020).

"In 2009, the ADA was amended by the addition of Section 12102(3)(B) to exclude 'transitory and minor' impairments from the 'regarded as' category of disability." *Minion v. Keystone Amerihealth Caritas*, No. CV 16-5454, 2020 WL 3056286, at *8 (D.N.J. June 8, 2020) (citing Pub. L. No. 110–325, 122 Stat. 3553). However, "this exception only applies if the impairment is both transitory, meaning lasting for less than six months, *and* minor, meaning 'objectively non-serious.'" *Id.* (citing *Eshleman v. Patrick Indus.*, No. 19-1403, 2020 WL 2781300, at *4–5 (3d Cir. May 29, 2020)). An impairment is "transitory" if it has "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Here, it is undisputed that Plaintiff's alleged condition was "transitory" within the meaning of the ADA because it did not persist for six months. *See id.* It is also undisputed that after fainting during a physical training exercise at the Camden County Police Academy ("Academy"), Plaintiff was taken to the hospital where he was diagnosed by emergency room physicians with "heat syncope, initial encounter, acute kidney injury ("AKI"), and dehydration." (SUMF ¶ 31-32.) Plaintiff was not admitted to the hospital for this condition, but discharged eight (8) hours later with a note from Dr. Alan Lucerna indicating "he may return to work on 08/16/2021." (*Id.* ¶ 33.) Plaintiff's discharge paperwork advised him to seek a follow-up consultation with two specialists—a nephrologist and a cardiologist. (*Id.* ¶ 34.) Medical notes from Plaintiff's follow-up

visit to The Heart House on August 16, 2021 state Plaintiff "follows up today after being discharged from the hospital "for what sounds like acute dehydration followed by heat exhaustion and probable early heatstroke symptoms." (*Id.* ¶ 34.) Medical notes from Plaintiff's renal consultation on August 20, 2021 indicate that Plaintiff experienced an episode of syncope while training at the academy. (*Id.* ¶ 42.) The same day, Plaintiff's provider cleared him to return to work from a renal standpoint without restrictions, noting Plaintiff "has made a full recovery from his AKI, he is cleared to go back to work from a renal standpoint." (*Id.* ¶¶ 43-44.)

Notably, in Plaintiff's related workers' compensation action against Defendant, Plaintiff was evaluated by Dr. Goldstein, who issued a permanency report on behalf of Defendant. (*Id.* ¶ 95.) Dr. Goldstein's report noted that Plaintiff "was able to return to full-duty work at his previous jobs and continues to work in this capacity. He works 40 hours a week at one job and 12-14 hours in the other job. He does not have any work accommodations and does not feel he needs any." *Id.* The report further opined that "in addition to working 60 hours a week without any work accommodations, he exercises multiple times a week . . . There is nothing that he needs to do or feels that he should be able to do that he cannot do." (*Id.* ¶ 96.) Accordingly, Dr. Goldstein concluded that Plaintiff had "what is basically described as an incident," "was dehydrated," and "has no long-term ill-effect or permanency reasonably attributable to the 08/09/2021 incident." (*Id.* ¶¶ 97-98.)

Plaintiff has not—and cannot—identify any countervailing record evidence that supports his claim that he was "substantially limited" in performing one or more major life activities as a result of the incident. *See* 42 U.S.C. § 12102(1)(A). "At summary judgment, a plaintiff cannot rely on unsupported allegations but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407

(3d Cir. 2000) (applying collateral estoppel to bar the employee from challenging factual finding in workers' compensation proceeding that he fully recovered from his work-related injury and affirming grant of summary judgment on the basis that the plaintiff was not disabled within the meaning of the ADA). Moreover, Plaintiff concedes that if the Court finds that he was not disabled pursuant to § 12102(1)(A), "then his claim for record of impairment must also fail." (Pl.'s Opp. Br. at 11); *see* § 12102(1)(B).

This leaves only Plaintiff's "regarded as" claim. As previously noted, the ADA excludes "impairments that are transitory and minor." 29 C.F.R. § 1630.15(f); *see Eshleman*, 2020 WL 2781300 at *4–5. Here, all the medical evidence of record demonstrates that Plaintiff's brief, one-time bout of dehydration, heat syncope, and acute kidney injury were both transitory and minor. Plaintiff does not offer any evidence that Defendant believed Plaintiff's brief medical episode impaired his ability to perform any major life activities.

Accordingly, the Court finds that no reasonable juror could conclude that Plaintiff was "regarded as" disabled because his condition was both "transitory and minor." *See* 29 C.F.R. § 1630.15(f). For these reasons alone, Defendant is entitled to summary judgment as a matter of law with respect to Plaintiff's discrimination claim.

### ii. Even If Plaintiff Were Able To Establish A Disability, Plaintiff Fails To Show That He Is A "Qualified Individual" Under The ADA.

Even if this Court agreed with Plaintiff and determined that there was a genuine issue of material fact as to whether he was disabled within the meaning of the ADA, Plaintiff cannot establish that he was qualified to perform the essential functions of his job with or without reasonable accommodations by Defendant.

A "qualified individual" under the ADA is defined as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such

individual holds or desires." 42 U.S.C. § 12111(8). The burden is on a plaintiff to show that he is a "qualified individual." *Buskirk v. Apollo Metals*, 307 F.3d 160, 168 (3d Cir. 2002). In order to determine whether someone is a qualified, the Third Circuit uses a two-part test. *Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir. 1998). First, a court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* Second, the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* "The determination of whether an individual with a disability is qualified is made at the time of the adverse employment decision." *Id.*; *see also Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996).

"Whether a job duty is an 'essential function' turns on whether it is 'fundamental' to the employment position." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (citing 29 C.F.R. § 1630.2(n)(1)). "A job function may be considered essential for any of several reasons, including, but not limited to," the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Turner*, 440 F.3d at 612 (quoting 29 C.F.R. § 1630.2(n)(2)). "Evidence of whether a particular function is essential includes, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;

16

(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). In New Jersey, an individual is required to possess an NJPTC certification for the Basic Training Course for Police Officers ("BCPO") from an NJPTC-certified New Jersey Police Academy to be eligible for service as a police officer. *See* N.J.A.C. § 17:4-2.4.

Here, Plaintiff was not a "qualified individual" for the position he desired as a New Jersey police officer because he did not possess the NJPTC certification required as a seminal condition of his employment. *See id.* It is undisputed that Plaintiff was informed numerous times—during the hiring process, onboarding, in his offer of employment, FOP agreement, the job description of the position, and following his fainting spell—that his employment was conditioned on obtaining the required training certification. (SUMF ¶¶ 7-8, 11.) Thus, Plaintiff was not qualified to perform the essential functions of a New Jersey police officer at the time of the alleged adverse employment action. *See* N.J.A.C. § 17:4-2.4.

Plaintiff argues that even if he was not qualified to serve as a full time police officer when the alleged adverse decision occurred, he was qualified to remain a police recruit after his resignation from the Academy because recruits are hired prior to attending it, based only on "passing written and physical fitness examinations, a background check, being interviewed, and undergoing a psychological evaluation to determine whether the applicant is qualified for the position." (Pl.'s Opp. Br. at 14 (citing SUMF ¶ 4.)) Plaintiff contends that a jury could find that he was able to perform the essential functions of his job and meet the condition of obtaining NJPTC certification "with an accommodation of time to heal" and permit him to restart his training with the next Academy class in time to obtain his NJPTC certification within twelve months. (*Id.* ¶ 15.)

17

It is undisputed that on the date of the alleged adverse employment action—August 24, 2021—Plaintiff did not meet the requirement for the position of police officer and thus was not qualified. (SUMF ¶ 81.) By that date, Plaintiff had not been cleared from a cardiac standpoint to return to work. (*See id.* ¶¶ 31-35, 40-48.) Defendant did not know at that time whether Plaintiff would be cleared to return to the Academy at all. (*See id.* ¶ 51.) Plaintiff himself testified that he was not physically capable of attending the Academy at that time. (*Id.* ¶ 48.)

Moreover, even if Plaintiff were medically cleared by his doctors and felt he was physically capable of returning to his training, he would still be required to reapply for the next Academy, pass new physical and psychological evaluations, and receive clearance from the Academy to return. (*See* Response to Plaintiff's Counterstatement of Material Facts ("RCSMF") ¶ 187.) And it was the Academy, not Defendant, that had the sole ability to make such determinations. Plaintiff argues that other recruits were not terminated by Defendant pending their recovery from minor training injuries, however, those recruits remained enrolled in the Academy, did not miss more than ten days of Academy training, and did not resign from the Academy as Plaintiff did here.[3] (CSUMF ¶¶ 190-191.) Thus, in effect, Plaintiff sought an accommodation from Defendant of indefinite or indeterminate leave to complete the Academy. The Third Circuit has held that a request for leave "for an indefinite and open-ended period of time . . . does not constitute a reasonable accommodation." *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 586 (3d Cir. 2004); *see also Shafnisky v. Bell Atlantic, Inc.*, 2002 WL 31513551, *11 (E.D. Pa. Nov. 5, 2002) ("Open-ended disability leave is not a reasonable accommodation.").

---

[3] Critically, when faced with determining how or if to continue attending the Academy, Plaintiff was advised his dismissal from the Academy would bar him from attending in the future, whereas a resignation would leave open the opportunity to reapply for the Academy. (CSUMF ¶ 68.) The undisputed record reflects that Plaintiff never reapplied for the Academy following his resignation, thereby underscoring his lack of qualifications for the position. (*See* SUMF ¶ 91; RSUMF ¶ 91.)

Furthermore, contrary to Plaintiff's assertions, Defendant was not required to afford him the opportunity to remain on Defendant's payrolls without his NJPTC certification in a "light duty" capacity pending his completion of the Academy or to seek a waiver from Academy training on his behalf. (*See* Pl.'s Opp. Br. at 15-18.) It is well settled that an employer is not required to create a light duty position or a new position, or remove an essential function of a position, as an accommodation. *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 285, n.4 (3d Cir. 2001). While Plaintiff insists that light duty roles existed for recruits, the examples Plaintiff cites involve recruits who remained enrolled in the Academy—which is undisputedly the seminal function of being a recruit. (SUMF ¶¶ 7-8, 11; CSUMF ¶¶ 190-191); *see* N.J.A.C. § 17:4-2.4.

Accordingly, the Court finds that no reasonable juror could conclude that Plaintiff can satisfy his burden of proving that he was a "qualified individual" at the time of Plaintiff's alleged adverse employment action. *See Buskirk*, 307 F.3d at 168. For all of these reasons, Plaintiff fails to establish a *prima facie* case for disability discrimination and, accordingly, this Court grants Defendant's motion for summary judgment on Plaintiff's discrimination claims as a matter of law.

### iii.  <u>Whether Plaintiff Suffered An Adverse Employment Action Based On His Alleged Disability.</u>

Defendant also argues that it did not subject Plaintiff to an adverse employment action because Plaintiff resigned from the Academy of his own volitation, which Defendant construed as a resignation from his employment with Defendant because Plaintiff knew that employment was contingent on his completion of the Academy. (MSJ Br. at 26-27; *see* SUMF ¶ 81.) Yet Defendant maintains throughout its brief that Defendant and the Academy are distinct entities. (MSJ Br. at 23-24, 28-29.) While Defendant notified Plaintiff that it construed his resignation from the Academy as a resignation from Defendant, the record reflects that Plaintiff resigned only from the

Academy. (CSUMF ¶ 74.) Plaintiff maintains that he did not intend to resign from Defendant and intended to seek an Academy waiver or light duty with Defendant after his resignation.

Accordingly, there is a genuine dispute of material fact as to whether Defendant indeed subjected Plaintiff to an adverse employment action by construing his resignation from the Academy as a resignation from Defendant, and the Court need not resolve that issue at this stage because Defendant is entitled to summary judgment on other grounds stated in this Opinion.

### iv. Defendant Had A Legitimate, Non-Discriminatory Reason For Terminating Plaintiff and Plaintiff Cannot Establish Pretext.

Even if Plaintiff could establish a *prima facie* case of discrimination, he cannot establish that he suffered an adverse employment consequence because of a disability. Defendant has advanced a legitimate, non-discriminatory reason for terminating Plaintiff—his absences from the Academy and subsequent resignation. Plaintiff has adduced no record evidence suggesting that Defendant terminated Plaintiff because it believed that he had a disability. Accordingly, no reasonable juror could find that Plaintiff can demonstrate the legitimate reason for his alleged termination was pretextual.

### b. Plaintiff Cannot Establish a Failure to Accommodate.

"The failure to accommodate is one of two distinct categories of disability discrimination claims[.]" *Rich v. State*, 294 F. Supp. 3d 266, 278 (D.N.J. 2018). To establish a *prima facie* claim of failure to accommodate, a plaintiff must establish that: (1) the plaintiff was disabled within the meaning of the ADA; (2) the plaintiff was qualified to perform the essential functions of the position, with or without accommodation; (3) the plaintiff suffered an adverse employment action because of his disability; and (4) the defendant sought another to perform the same work after Plaintiff had been removed from the position. *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 125 (D.N.J. 2020) (internal citations omitted). The failure to reasonably accommodate a qualified

disabled employee constitutes an adverse employment action for purposes of the ADA. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004). Summary judgment is appropriate where the plaintiff fails to raise a genuine issue of material fact as to one or more elements of the plaintiff's *prima facie* case. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997).

The ADA's regulations provide that: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). The EEOC's interpretive guidelines further provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359.

Here, Plaintiff cannot establish a *prima facie* case for failure to accommodate because, as discussed in Section IV(a) *supra*, no reasonable juror could find that Plaintiff was disabled or qualified to perform the essential functions of his position. The Court further notes that the undisputed record evidence shows that Defendant engaged with Plaintiff's request for an accommodation in the form of a waiver from the Academy to obtain his NJPTC certification, researched the waiver process, and determined that the New Jersey Police Training Commission exclusively determines whether an individual may be granted a waiver from attending all or a

portion of the Academy. (SUMF ¶ 14.) Defendant also determined that Plaintiff was not eligible to serve as a police officer without his NJPTC certification. *See* N.J.A.C. § 17:4-2.4.

Thus, the record reflects that Defendant engaged in an interactive process with Plaintiff and determined that no reasonable accommodation was available. (SUMF ¶ 17, 67.) For these reasons, Plaintiff's failure to accommodate claim fails.

### c. **Plaintiff Cannot Establish a Retaliation Claim.**

ADA retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 35 (3d Cir. 2017). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he "subsequently or contemporaneously suffered an adverse employment action," and (3) there is "a causal link between the protected activity and the adverse action." *Id.* at n.14. If the plaintiff establishes a *prima facie* case of retaliation, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action against the plaintiff. *Id.* at 36. "[I]f the defendant does so, the burden then returns to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason is a pretext for retaliation." *Id.* "Our experience is that most cases turn on the third stage, *i.e.,* can the plaintiff establish pretext." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999)

Here, even assuming that Plaintiff could make out a *prima facie* case of retaliation, he has failed to demonstrate that Defendant's reasons for the adverse employment action were pretextual. To establish pretext, Plaintiff must either: (1) discredit Defendant's proffered reasons, either directly or circumstantially; or (2) adduce evidence, whether direct of circumstantial, "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff

must demonstrate "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Id.*

As noted throughout this Opinion, Plaintiff could not serve as a New Jersey police officer without obtaining an NJPTC certification, which was an express condition of his employment with Defendant. *See* N.J.A.C. § 17:4-2.4. Thus, Defendant had a legitimate, non-discriminatory reason for the alleged adverse employment action. *See Wells*, 702 F. App'x at 35. Moreover, robust record evidence demonstrates that recruits trained in jurisdictions outside of New Jersey are required to attend Academy training, and the decision to grant a waiver was not Defendant's to make. (SUMF ¶¶ 14-17, 66-72.) Plaintiff has presented no countervailing evidence that similarly situated recruits were permitted to remain on the payroll in a light duty capacity while not enrolled in the Academy or were granted the broad waiver he requested. (*See* Response to SUMF ("RSUMF") ¶ 17; CSUMF ¶¶ 190-191.)

In reviewing the record, the Court concludes that no reasonable juror could find Plaintiff has demonstrated it is more likely than not that discrimination, rather than Plaintiff's lack of qualifications, caused the adverse employment action alleged here. Accordingly, the Court grants summary judgment in favor of Defendant with respect to Plaintiff's ADA retaliation claim.

### d. **Plaintiff Cannot Establish a Workers' Compensation Retaliation Claim.**

The New Jersey Workers' Compensation Act states, in pertinent part:

> It shall be unlawful for any employer or his duly authorized agent to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation benefits from such employer, or because he has testified, or is about to testify, in any proceeding under the chapter to which this act is a supplement.

N.J.S.A. 34:15-39.1. To make a *prima facie* case of retaliation for making a workers' compensation claim, a plaintiff must prove: "(1) that he or she made or attempted to make a claim

for workers' compensation; and (2) that he or she was discharged in retaliation for making that claim." *Cerracchio v. Alden Leeds*, 223 N.J. Super. 435, 442-43 (App. Div. 1988). Courts require a causal nexus between the discharge and the workers' compensation claim. *See Carter v. AFG Indus. Inc.*, 344 N.J. Super. 549, 557 (App. Div. 2001). "New Jersey courts have consistently held that workers' compensation is not a protected leave and have specifically rejected the argument that an 'employer had a duty to hold [employees with workers' compensation claims] job open until [they] were able to return to work.'" *Wraith v. Wayfair, Inc.*, No. CV 20-6054, 2023 WL 4488045, at *7 (D.N.J. June 12, 2023), *aff'd*, No. 23-2400, 2024 WL 4144065 (3d Cir. Sept. 11, 2024).

Here, Plaintiff sets forth no facts demonstrating that he was "discharged in retaliation for making" a workmen's compensation claim. *Cerracchio*, 223 N.J. Super. at 442-43; *see Hejda v. Bell Container Corp.*, 450 N.J. Super. 173, 192 (App. Div. 2017). Indeed, it is undisputed that Defendant worked with Plaintiff to ensure that he received benefits. (SUMF ¶¶ 36-48, 64-66); *see Wraith*, 2024 WL 4144065, at *2 (affirming grant of summary judgment against the plaintiff's retaliation claim where the employer assisted him in filing a workmen's compensation claim). Further belying Plaintiff's retaliation claim, Defendant did not seek to recoup workmen's compensation overpayments made to Plaintiff. (*Id.* ¶ 66, n.9.) Thus, the record lacks the necessary evidence that Plaintiff's filing of a workmen's compensation claim "entered into the decision" to terminate him. *See Galante v. Sandoz, Inc.*, 192 N.J. Super. 403 (Law. Div. 1983), *aff'd*, 196 N.J. Super. 568 (App. Div. 1984).

Accordingly, the Court will grant Defendant's Motion for Summary Judgment with respect to Plaintiff's workers' compensation retaliation claim.

## V.    <u>CONCLUSION</u>

For all the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 55) is **GRANTED**. An Order consistent with this Opinion shall follow.

Dated: June 30, 2025

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE